**In the Matter of PLAZA TOWERS, INC., Debtor.**

**In Proceedings for the Reorganization of a Corporation.**

**No. 66–995.**

United States District Court
E. D. Louisiana,
New Orleans Division.

May 4, 1967.

Thomas H. Kingsmill, Jr., James J. Morrison, New Orleans, La., Robert M.

Welch, Jr., Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, Tex., for debtor.

Cicero C. Sessions, Sessions, Fishman, Rosenson, Snellings & Boisfontaine, New Orleans, La., for Leonard R. Spangenberg, Jr.

J. B. Kiefer, Graham & Graham, New Orleans, La., for certain debenture holders.

Walter F. Marcus, Marcus & Marcus, Harry B. Kelleher, James A Churchill, Lemle & Kelleher, New Orleans, La., Ben R. Downing, Jr., Sanders, Miller, Downing & Kean, Baton Rouge, La., George B. Balamut, Bernard Diamond, Simpson, Thacher & Bartlett, New York City, for Manufacturers Hanover Trust Co.

Leon Sarpy, Harry T. Howard, III, Peter A. Feringa, Jr., Chaffe, McCall, Phillips, Burke, Toler & Hopkins, New Orleans, La., for United States Steel Corp.

Ewell P. Walther, Jr., Campbell C. Hutchinson, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, La., for George A. Fuller Co., Inc.

Moise S. Steeg, Jr., Steeg & Shushan, New Orleans, La., for Estate, Inc.

F. D. V. de La Barre, Drury & Lozes, New Orleans, La., for William J. Mouton, Jr.

Anthony J. Russo, William J. Lopez, New Orleans, La., for Anthony J. Russo.

A. J. Marciante, New Orleans, La., for Luckmore Finance Corp.

Leopold Stahl, Stahl & Sear, New Orleans, La., for Boyd Allison.

M. L. Dresner, Dresner & Dresner, New Orleans, La., for H-Tide Realty, Inc.

Ivor A. Trapolin, New Orleans, La., for Edward M. Alba.

Robert J. Landry, New Orleans, La., for Peat, Marwick, Mitchell & Co.

Robert R. Rainold, New Orleans, La., for Louis Hoffman Co.

G. Edward Merritt, Terriberry, Rault, Carroll, Yancey & Farrell, New Orleans, La., for Walco Construction Co.

HEEBE, District Judge.

Plaza Towers, a forty-five-story office building in New Orleans, is the tallest building in Louisiana. Unfortunately, it is only partially completed, the general contractor, George A. Fuller Company, Inc., having ceased work in October 1966. The petitioner herein, Plaza Towers, Inc., is the owner of the Plaza Towers and some thirteen other parcels of land, some improved and some unimproved, in an area between Canal Street and the Expressway in New Orleans. Disputes between the corporation and its creditors led to the initiation of a number of lawsuits against the corporation in the state courts. On November 29, 1966, less than two days before the Tower building and two adjacent properties were to be sold by state court foreclosure proceedings, this petition for reorganization under Chapter X of the Bankruptcy Act, 11 U.S.C.A. §§ 501–676, was filed. Prior to taking any action, the Court contacted the attorneys for Manufacturers Hanover Trust Company, the interim financer of and first mortgage holder on the Tower, and the attorneys representing mortgage creditors of the other properties, and met with them and attorneys for the debtor the next morning to listen to arguments for and against the issuance of a stay order. The following morning, pursuant to its powers under § 113 of the Bankruptcy Act,[1] 11 U.S.C.A. § 513, the Court stayed all further proceedings in the three mortgage foreclosure actions.

In the course of the next three months, the Court held several conferences with the interested attorneys. On February 23, 1967, the Court, pursuant to § 141 of the Bankruptcy Act, preliminarily approved the petition for reorganization, appointed a trustee for the debtor, and ordered that a hearing pursuant to § 161 of the Bankruptcy Act,[2] 11 U.S.C.A. § 561, be held on April 12, 1967.

It appeared that a § 144 hearing would also be necessary. The nature and purposes of § 161 hearings and hearings conducted pursuant to § 144 are entirely different, but for a very limited purpose the two are interrelated—under § 137, 11 U.S.C.A. § 537, answers controverting any of the material allegations of the petition, and thus necessitating a § 144 hearing wherein the judge must determine the issues presented by any answers, could be filed at any time prior to the § 161 hearing on April 12. In order to avoid duplication of trials, the simple expedient to follow is to wait until the date set for the § 161 hearing, which is the cut off date for the filing of answers, and thereafter proceed to hold a § 144 hearing on the issues raised by all the answers that had been filed.[3] However, here, United States Steel Corporation had already filed an answer on January 11, 1967, and several of the other creditors had made known their intentions to file answers shortly, and the Court was anxious to proceed quickly with the § 144 hearing in advance of the § 161 hearing: if the corporation was reorganizable, then there was no reason to delay the initiation of attempts to reorganize it; if the corporation was

1. "Sec. 113. Prior to the approval of a petition, the judge may upon cause shown grant a temporary stay, until the petition is approved or dismissed, of a prior pending bankruptcy, mortgage foreclosure or equity receivership proceeding and of any act or other proceeding to enforce a lien against a debtor's property * * *."

2. "Sec. 161. The judge shall fix a time of hearing, to be held not less than thirty days and not more than sixty days after the approval of the petition, of which

hearing at least thirty days' notice shall be given by mail to the creditors, stockholders, indenture trustees, the Securities and Exchange Commission and such other persons as the judge may designate, and, if directed by the judge, by publication in such newspaper or newspapers of general circulation as the judge may designate."

3. This course is suggested by Professor Gerdes, see 6 Collier on Bankrptcy, ¶ 6.-06, p. 1017.

beyond repair, then it would be unfair to needlessly delay the creditors' pursuit of their remedies. The solution has its basis in § 145 of the Act, 11 U.S.C.A. § 545, which provides:

"If *any issue* raised in an answer filed under § 136 or § 137 of this Act has \* \* \* already been tried and finally determined under the provisions of § 143 or § 144 of this Act, such final determination shall be conclusive for all purposes under this chapter." (emphasis added)

The omitted material in the above quote states the conditions under which the § 145 res judicata effect will operate. It will operate if the issues tried and determined under § 144 were

"after hearing upon notice to the debtor, creditors, indenture trustees, and stock holders entitled to controvert the allegations of the petition."

The notice referred to, necessary to effect res judicata, is not the notice required for § 161 hearings, but rather, is that notice required under the general provisions of the Act, by § 120:

"Whenever notice is to be given under this chapter, the court shall designate, if not otherwise specified hereunder, the time within which, the persons to whom, and the form and manner in which the notice shall be given. \* \*"

and § 207:

"Except where otherwise provided in this chapter, the judge may from time to time enter orders designating the matters in respect to which, the persons to whom, and the form and manner in which notice shall be given."

It thus appeared that in order for a § 144 hearing to have res judicata effect under § 145, the Court need only order such notice of the hearing as it deemed reasonable. This conclusion is further borne out by the absence of anything to the contrary in 11 Remington, § 4457, p. 143:

"By § 145, a final determination of issues raised by an answer is, after a hearing upon notice and trial of the issues, conclusive for all purposes under Chapter X."

or §§ 4480–81, p. 175:

"Under § 145, an order determining issues raised by a controverting answer, after hearing on notice, is conclusive."

Therefore the Court ordered that a hearing pursuant to § 144 be held beginning March 20, 1967, on the issues presented by the answer already filed by United States Steel and on the issues raised by any other answers filed on or before March 10, 1967, and ordered that the trustee give at least two weeks' notice of the § 144 hearing by certified mail to all persons entitled by law to receive notice. It was anticipated that the answers filed by March 10 would raise *all* the relevant issues, and thus, if everyone entitled to file an answer received notice, all the issues would be tried in the March 20 § 144 hearing and a decision thereon would, by virtue of § 145, have res judicata effect even though other answers might be filed subsequent to the § 144 hearing (but before the § 161 hearing).

The primary issue raised for our determination by the answers filed herein was that the petition was not filed in good faith. The § 144 hearing was thereupon begun on March 20 and continued the rest of that week and then intermittently, as prior commitments of the various attorneys permitted, for nine days. At the conclusion of the hearing, all interested parties were given one week to file memoranda, and the Court took the matter under advisement.

■ A petition for reorganization must be dismissed if the judge is not satisfied that it has been filed in good faith. Good faith is not affirmatively defined in the statute, but § 146 states four specific tests indicating when a petition has not been filed in good faith; only one of those tests is of concern herein—in the language of § 146(3), a pe-

tition shall be deemed not to be filed in good faith if:

"[I]t is unreasonable to expect that a plan of reorganization can be effected."

 Chapter X is designed for the benefit of all who have claims against or interest in the debtor. It is a remedial statute whereby both unsecured and secured debt, as well as interested stockholders, may be adjusted, modified, or otherwise dealt with. For purposes of good faith it is not necessary to show that an equity may exist for the stockholders, or even for all classes of creditors.[4] The requirement of good faith is satisfied if there is shown to be some possibility of an equity or value for creditors who are satisfied with the financial rehabilitation provided by Chapter X. Sections 130 and 179 of the Act, 11 U.S.C.A. §§ 530 and 579, clearly indicate that utilization of Chapter X proceedings by an insolvent debtor is both authorized and justified.[5]

If this proceeding is not dismissed now, then at some later stage we will be called upon to review the merits of any plans of reorganization that may be proposed.[6] At that time, we will have to take a searching look at the fairness, equity and feasibility of such plans. But, as stated by the Fifth Circuit in R. L. Witters Associates v. Ebsary Gypsum Co., 93 F.2d 746 (5th Cir. 1938), which arose under the predecessor to Chapter X, § 77(B) of the Bankruptcy Act, our present task herein is somewhat different:

"For though after final approval of the petition, as filed in good faith, the court retains full control over the proceeding to dismiss it if satisfied no feasible reorganization can be effected, it may, upon the issue of good

faith made * * * before the stage of filing and considering plans * * has been reached, inquire into the situation of the debtor, and as to the feasibility of a reorganization under the act. It should not, however, before the stage of plan submitting has arrived, examine into the feasibility of reorganization with the searching intensity required, when a plan or plans having been submitted by the petitioner, the good faith, and feasibility of plans for reorganization come directly up. * * *

"Under the rule [established by the cited cases], if it is clear that under no reasonable possibility can the debtor conform to and obtain the benefits of the statute, and that therefore the petition was manifestly filed, if by the debtor, for delay, or if by petitioning creditors, for harassment, the petition may be dismissed before the plan stage is reached, as wanting in the good faith the statute requires. Under that rule, where the good faith of the filing is attacked, before the plan stage has been reached, unless the impossibility of conforming to and obtaining the benefits of the statute clearly appears, the petition should not be dismissed as not filed in good faith."

Other circuits have also discussed the tests to be applied at this initial stage. Language similar to that of the Fifth Circuit has been used by the Ninth Circuit. In White v. Penelas Mining Co., 105 F.2d 726 (9th Cir. 1939), the Court, in affirming a district court finding of good faith which was based on the likelihood of finding minerals stated that

"The testimony is sufficient to show a reasonable probability. At any rate we cannot say that it is impossible."

The Second Circuit in In re Castle Beach Apartments, 113 F.2d 762 (2nd Cir.

---

4. In re Equity Co. of America, 115 F.2d 570 (7th Cir. 1940); In re Mortgage Securities Corp., 75 F.2d 261 (2nd Cir. 1935).

5. Under § 130, the corporation *must* be either insolvent or unable to pay its debts as they mature; under § 179, the

acceptance by the stockholders of an approved plan is necessary only where the corporation has not been found to be insolvent.

6. See §§ 174 and 216 of the Bankruptcy Act, 11 U.S.C.A. §§ 574 and 616.

1940), said, in affirming a district court finding of good faith that

"We cannot surely say that the attempt to reorganize is so hopeless that good faith is absent and so should uphold the judgment of the district court in that respect at this stage of the proceedings."

Subsequent to the decision of that case, the Second Circuit, in In re Marine Harbor Properties, 125 F.2d 296 (2nd Cir. 1942), affirmed 317 U.S. 78, 63 S.Ct. 93, 87 L.Ed. 64 (1942), further stated:

"No plan was, or could be, submitted by the debtor with its petition, and we see no error in the district judge's conclusion that the trustees in reorganization should have an opportunity to explore the possibilities and propose a plan before he should decide that it was unreasonable to expect that any reorganization could be effected."

▇▇▇ The burden of sustaining good faith is on the proponents of the petition. Marine Harbor Properties, Inc. v. Manufacturers Trust Co., 317 U.S. 78, 83, 63 S.Ct. 93, 87 L.Ed. 64 (1942). However, synthesizing the holdings of the various circuits under § 146, with the Fifth Circuit's holding under § 77(B), supra, it is our feeling that this burden is met when the status of the debtor corporation is shown to be such that it cannot be said that the prospects for reorganization are so remote that it is not worth a few additional months' delay to give the trustee time to propose a plan of reorganization. It must be remembered that a finding of good faith in the filing of the petition is, at this stage, only tentative: if good faith is found, the Act requires that the court fix a time within which the trustee shall prepare and file a plan or a report of his reasons why a plan cannot be effected, § 169, 11 U.S.C.A. § 569, and if at that or any stage of this proceeding, it becomes apparent that no plan can be effected, the requested relief will be quickly denied.

We do not believe the more recent Fifth Circuit cases cited by one of the creditors, Caplan v. Anderson, 256 F.2d 416 (5th Cir. 1958), and Mongiello Bros. Coal Corp. v. Houghtaling Properties, Inc., 309 F.2d 925 (5th Cir. 1962), have any effect on our conclusion as to the test to be applied at this stage. In both those cases, the district court had denied any relief from its stay orders to mortgage holders of the debtor. The Mongiello case, 309 F.2d at 929, accurately describes the situation present in Caplan:

"The mortgagee contended that the proceeding had been pending for nine months, that no plan for reorganization had been submitted nor was there any possibility for any successful plan of reorganization. It appeared that there had been no hearing on the question of good faith and we reversed with directions that immediate and full hearings on the motion be had * * * *"

In view of those proceedings in the district court, there was ample reason for the strong action thereupon taken by the Fifth Circuit:

" * * * and with the stay to be vacated unless immediate and satisfactory provision was made for the protection and satisfaction of the debt, or in the absence of a clear showing that the rights of the mortgage holder would not be affected by further delay."

In the *Mongiello* case itself, the district judge had found that the petition was filed in good faith but had made no findings of fact in connection therewith. The Fifth Circuit, prior to remanding the case for further findings on the question of good faith, commented on the facts of the case, which indicated that the debtor corporation had been organized and had had property conveyed to it by a financially unsound individual and a similarly situated corporation for the sole purpose of reorganization of their affairs. We believe, therefore, that the result in *Caplan*, and its reaffirmance in *Mongiello*, is a product of the unusual situation and clear injustice presented by the prior proceedings in the district

courts in those cases. In any event, we find here that the debtor has made a clear showing that the rights of the secured creditors will not be affected by the relatively short further delay which would be required to formulate and present a plan of reorganization. Although there can be no mathematical certainty as to the value of the properties herein involved, we find that in each case the value of the property is sufficient to provide adequate security for any delay in satisfying the claims of the secured creditors.

Indirectly, this leads us to another sub-issue which is before us. Some of the creditors have argued that, since under § 179 of the Act, 11 U.S.C.A. § 579, no plan may be put into effect unless approved by creditors holding two-thirds in amount of the claims filed and allowed of each class, then no plan of reorganization can be adopted without the favorable vote of the Manufacturers Hanover Trust Company, which holds the sole first mortgage lien on the Tower building itself, and represents over two-thirds of the secured indebtedness in the entire corporation; since Manufacturers has strenuously and continuously made clear its position that it will not approve any plan of reorganization, then no plan of reorganization can be adopted, and thus it may now be urged that it is unreasonable to expect that a plan of reorganization can be effected.

This argument ignores several factors. First, if initial objections were permitted to defeat the petition at the very beginning, the remedial purpose of Chapter X usually could be stultified, and every attempt to reorganize could be smothered. 6 Collier on Bankruptcy, ¶ 6.09, p. 1046. Second, when a plan is later presented for consideration by Manufacturers, it may well be that their announced dis-

approval will be converted into acceptance. See 6 Collier on Bankruptcy, ¶ 6.09, p. 1046, citing In re East Boston Coal Co., 30 F.Supp. 811 (M.D.Pa.1940):

> "[T]he mere fact that the preferred creditor arbitrarily states that he will not accept any plan which may be submitted is not alone sufficient cause to compel the denial to the debtor of the right of proposing a plan which the preferred creditor, in a more reasonable mood, may accept."

Lastly, Manufacturers' announced disapproval extends to any plan that does not provide for the immediate liquidation and payment and discharge in full of its claim. Of course, if a plan were to be confected whereby Manufacturers was paid in full, then under § 179, as a creditor who is "not affected by the plan," its vote is unnecessary to approval of the plan. One of the creditors opposing the petition herein has done a thorough job in arguing that trustee certificates may not be used to complete the building.[7] Nonetheless, it may well be that a plan of reorganization could be proposed which would secure new financing to replace the secured indebtedness now in existence. In the event such financing were secured, then the secured creditors would be paid, and their votes would become unimportant.

██ The argument that initial stated objections should be considered relies too heavily on pronouncements of the Fourth Circuit, which, upon examination, are found to have doubtful origins and which conflict with the clear language of the Fifth Circuit. The initial Fourth Circuit case on this point was Arey & Russell Lumber Co. v. American National Bank & Trust Co. of Danville, Virginia, 201 F.2d 508 (4th Cir. 1953). The facts there were very unusual for a subject for reorganization—the corpora-

---

**7.** That argument, the validity of which we need not pass on at this time, may be capsuled as follows: if trustee certificates were to be issued subject to the superior claims of secured creditors, there would be very little market for them; but if they were made superior to the claims of secured creditors, their issuance would not be equitable, under § 116(2) of the Act, 11 U.S.C.A. §§ 516 (2) formerly § 77B(c) (3), as interpreted by In re Prima Co., 88 F.2d 785, 116 A.L.R. 766 (7th Cir. 1937), and subsequent cases.

tion had assets of $290,000 and owed taxes and unsecured debts totaling $9,000, and secured debt of $12,400. The Fourth Circuit did say that:

> "Since the entire secured indebtedness was held by a single creditor that had clearly indicated that it would not grant any extension, it was unreasonable to expect that a plan of reorganization could be effected."

However, also present in that case was the fact that the corporation had originally filed a petition for an arrangement under Chapter XII which had been dismissed on the ground that the petitioner was a corporation, and that the manifest purpose of the Chapter X filing was to obtain just such an extension of the indebtedness secured by the deed of trust as had been sought in the Chapter XII proceeding and which Congress had seen fit to deny to corporate debtors, and there was no need to reorganize the other indebtedness. The next case, Leas v. Courtney Co., 261 F.2d 13 (4th Cir. 1958), stated that the refusal of the only secured creditor to agree to any plan of reorganization effectively bars reorganization, but no citation or authority of any sort for this proposition is given; the *Arey & Russell* case, the only case cited in the entire opinion, is cited for a different point, even though the Court remarks that it is strikingly similar to the case before it. Subsequently to *Arey & Russell* and *Leas,* Janaf Shopping Center v. Chase Manhattan Bank, 282 F.2d 211 (4th Cir. 1960) was decided. This case is discussed in greater detail, infra, but here we note merely that it cited only those two cases, but to some degree, with regard to the issue of announced opposition of creditors, backed away from the rule established in those cases, and stated that

> " * * * the expressed opposition of the lienholders * * * is a factor to be weighed unless it is clear that the objecting creditors would not be affected by the plan, but such opposition is not itself necessarily determinative of the question."

The rule in the Fifth Circuit, which not only binds us but which we believe our comments above indicate to be the better rule, was stated in York v. Florida Southern Corp., 310 F.2d 109, 110 (5th Cir. 1962):

> "We do not believe that the fact, standing alone, that a class of secured creditors announces in advance that it will not agree to a reorganization makes it impossible for a Chapter X reorganization petition to be filed in 'good faith'."

This rule was reaffirmed in Corr v. Flora Sun Corp., 317 F.2d 708 (5th Cir. 1963), where it was contended that the debtor's petition could not be filed in good faith because of the announced opposition by secured creditors to any plan of reorganization which did not provide for complete and immediate payment of the secured indebtedness. The Fifth Circuit stated, at 710, that it

> " * * * has clearly rejected this contention as a proper basis for defeating Chapter X proceedings at their inception."

▮ Having set out our understanding and appreciation of the law applicable at this stage of the proceeding, we turn now to an evaluation of the debtor's financial condition in order that we may determine whether "it is unreasonable to expect that a plan of reorganization can be effected," and accordingly whether or not the petition was filed in good faith.[8]

---

8. As discussed supra, p. 4, good faith is not affirmatively defined in the statute. Therefore, the mere passage by a petition of the four negative tests in § 146, 11 U.S.C.A. § 546, does not assure that the petition will be found to have been filed in good faith, because that term contains unspecified general elements. See 6 Collier on Bankruptcy, ¶ 6.07 [2], pp. 1025–31. However, in the matter before us, the facts and circumstances do not disclose that the filing of the petition did not meet all the general elements of good faith, and our consideration is thus limited to the one applicable negative test.

Despite the length of the hearing, the large number of witnesses, the varied assortment of exhibits offered in evidence and the long and detailed cross examination of some of the witnesses, almost all of the evidence fell into one of three main categories. At the inception of the hearing the Court met with all counsel in Chambers for the purpose of ascertaining the possibility of obtaining stipulations of fact in order to limit the scope of the hearing. As a result of this conference and the subsequent dedicated, conscientious, and diligent efforts of counsel who met together, out of the presence of the Court, for the balance of the day, a written stipulation was effected. In addition to points directed to several articles of the debtor's petition and other matters, this stipulation covered two of the three principal categories of evidence. First, counsel stipulated in essence the physical cost of completing the Plaza Towers building to be approximately $4.8 million, although in the stipulation the debtor did not admit that it was liable for this cost of completion; its assertion is that it can compel completion of the building without itself having to expend that sum.[9] Secondly, counsel stipulated into evidence two financial reports reflecting the total liabilities of the debtor corporation—the report prepared by Haskins & Sells for Manufacturers Hanover Trust Company and the report prepared by LaPorte, Girot, Sehrt & Romig at the request of the trustee. The Haskins & Sells report shows the debtor's liabilities as of February 1, 1967, to be $21,624,588.74 after the sum of $4,827,734.00, the cost of completing the Tower building, is subtracted from the total which included this completion cost. The report prepared for the trustee shows the debtor's total liabilities as of March 3, 1967, to be $21,303,086.90. The difference between these two reports is then approximately $300,000.00, and all this was reflected in the stipulation.

With the stipulation thus covering two of the main elements of the debtor's financial status, the sole issue remaining for the presentation of live and documentary evidence was the evaluation of the debtor's properties. The debtor called Leonard R. Spangenberg, Jr., a very capable architect; E. A. Tharpe, II, who has done extensive appraisal work for the United States government; Louis Bisso, a well recognized planning consultant who was for a number of years the Planning Director for the City of New Orleans; Joseph W. Simon, Jr., the Executive Vice President of the Chamber of Commerce for the City of New Orleans; and Joseph M. Rault, Jr., an attorney who is a very active leader in the civic and economic life of the New Orleans Metropolitan Area, Chairman of the New Orleans Union Passenger Terminal Board, and also the owner of a new office building, which is almost ready for occupancy, in the downtown business district of the city. The creditors opposing the debtor's petition for reorganization produced two expert witnesses—James P. Ewin, Jr., a civil engineer, and Omer F. Kuebel, a most competent real estate appraiser—in addition to documentary evidence. Counsel for Mr. Spangenberg, who is a creditor in these proceedings called two witnesses from the National American Bank of New Orleans prior to closing the evidence in this matter.

The net result of the story related by this group of highly talented and able witnesses was simply that the value of the debtor's properties was within the range from the approximately $15.5 million contended by the creditors opposing the petition to the $29 million contended by the debtor and the supporting creditors. Frankly, this Court, at this stage of the case, is unable to reconcile the disparity in evaluations; however, at this stage it is not necessary that we do so, for if the high valuation is anywhere near accurate, then the unsecured creditors supporting reorganization have a

9. Generally, this assertion is founded on the debtor's alleged claim against Fuller, see footnotes 10 and 11, infra.

substantial equity in the corporation which would be lost to them in foreclosure proceedings. We find that the high valuation has sufficient basis in fact and reason to preclude our holding that the prospects of reorganization are remote or that there are clearly no values to be preserved for the junior interests.

In connection with this finding there are some additional general comments on the evidence that appear germane to a consideration of the issue before us. It is uncontradicted that the city of New Orleans is now, and has been, enjoying an unprecedented economic boom which shows no sign of recession. Mr. Simon was very emphatic in his testimony to the effect that there is heavy demand and a great need for additional office space in the area. In addition, it was established that there is a great shortage of hotel facilities in the city. Beyond these indisputable realities of economic life, the city is awaiting construction of a domed stadium and the arrival of professional football in the garb of the New Orleans Saints of the National Football League. The domed stadium and professional football will serve as catalysts to the economy of the community which already is vibrant with industrial, business and tourist activity and yet is on the threshold of even greater development. More particularly, the Gulf South Research Institute has recommended for the location of the domed stadium a downtown New Orleans site which is in close proximity to the Plaza Tower building and the other properties owned by the debtor corporation. Although there is no certainty that this location will be the one finally chosen, the possibility seems to be far greater than the possibility of finding ore discussed in *Penelas Mining,* supra, and that possibility lends further weight and credence to the testimony and valuations given by the witnesses for the debtor.

For all of the foregoing reasons, we believe Janaf Shopping Center, supra, 282 F.2d 211 (4th Cir. 1960), to be distinguishable on its facts. A cursory reading of that case discloses apparently uncanny similarities between the situation there recited and the problems facing the debtor herein. However, our findings as to the evaluation of the debtor's properties and the as yet untapped potential they represent lead us to the firm conclusion that the prospect of reorganizing Plaza Towers, Inc., is far greater than was that of Janaf Shopping Center, Inc., and therefore, despite the somewhat parallel situations involved, we feel that *Janaf* is not determinative of the matter before us.

It is therefore our conclusion that it is not unreasonable to expect that a plan of reorganization can be effected, and accordingly that the petition was filed in good faith. Further, the Court is satisfied that the petition complies with the requirements of Chapter X of the Bankruptcy Act and that the material allegations are sustained by the proofs.

In conclusion we feel constrained to comment on the subissue which reached us as a result of the debtor's filing in the state court, prior to the filing of this reorganization petition, a $96 million lawsuit against Fuller based on Fuller's abandonment of construction. The debtor attempted to introduce that lawsuit into evidence in this proceeding in order to enhance its financial portrait. The creditors opposed to reorganization objected, and Fuller reserved its right to introduce into evidence a certified copy of its answer and reconventional demand filed in the state court proceeding. At that time the Court asked Fuller to defer filing that evidence until a ruling had been made on the admissibility of the suit by the debtor. That ruling was reserved by the Court and taken under submission. It is now our decision to admit into evidence and consider the lawsuit for the reasons and for the limited purpose set out below. As will appear and be made clear from those reasons, we would also allow Fuller to file into evidence its answer and reconventional demand which it had filed in the state court proceedings—although we do

not have those pleadings formally before us, as explained above, Fuller has delineated in its brief the theory of its defense and reconventional demand, and we have thus been able to give full consideration to that theory.[10]

 Although we are in no position to place any value on the debtor's pending lawsuit against Fuller,[11] for purposes of the present determination we cannot help but take into consideration any possibility of its success as a factor which lends additional support to our finding of good faith in the filing of the petition. Despite the arguments for counsel for the creditors opposing the petition, there is simply no hard and fast rule requiring the Court to completely disregard this state court suit. Although the courts have held that, for the purpose of determining solvency or insolvency of the debtor in ordinary bankruptcy proceedings, claims of the debtor may not be considered as property within the meaning of § 1(19) of the Act, 11 U.S.C.A. § 1(19), formerly § 1a(15), if they are of "doubtful validity" or if they cannot "be rendered available for the payment of debts within a reasonable time," In re Cooper, 12 F.2d 485, 486 (D.Mass.1926); see also First National Bank of Wilkes Barre v. Wyoming Valley Ice Co., 136 F. 466, 469 (M.D.Pa. 1905), even in ordinary bankruptcy a pending lawsuit, like any other unliquidated asset, may be considered to whatever extent its value may be fixed by the trier of fact. Thus, in Penn v. Grant, 244 F.2d 309 (9th Cir. 1957), although the Court affirmed the referee's determination of insolvency, it stated, at 310,

that the weight to be given to a pending lawsuit by the debtor was "properly within the discretion of the referee." But even were the principle in ordinary bankruptcy as strict as the objecting creditors would have us believe, such a rule simply does not have any direct bearing on the issue of good faith in a reorganization proceeding. On the contrary, the purpose of reorganization under Chapter X of the Act is to avoid the harsh effects of bankruptcy where assets are *not* immediately available, and to provide for the rehabilitation of an enterprise—and a reasonable possibility that it may be rehabilitated is all that is necessary to a showing of good faith.

 This is not to say that we are prepared to put any value on the state court suit, or that the suit is necessary to our decision, but neither can we overlook the fact of its existence; and to the extent that it indicates a possibility of recovery by the debtor, it does tend to substantiate the debtor's good faith. Preliminary proceedings on the issue of the good faith of the petition for reorganization are not the occasion for an exhaustive consideration of the validity or invalidity of claims in order to determine their precise value. The only question at this point is the possibility of an effective reorganization, and no cases on the precise point of the weight to be given pending lawsuits in evaluating this possibility have been found; the creditors opposing reorganization have brought to the Court's attention a number of cases on related points which, although helpful, are not determinative. In re *Cooper*, supra, *Wyoming Valley Ice Co.*, supra, and Penn v. Grant, supra, all

---

10. Briefly, Fuller contends that its stoppage of work was not a breach of the construction contract, but rather was occasioned by the debtor's default on the monthly progress payments due Fuller in August and September. Accordingly, Fuller denies liability to Plaza Towers, Inc.; rather, it argues that it has a claim against the debtor herein for work performed. See footnote 13, infra.

11. We do feel it necessary to note that the claim for $96 million seems to seek, to

some degree, depulicate recovery. It first avers that the Tower building is worth $20.5 million and would probably be sold at foreclosure proceedings for $12 million, leaving the debtor with a loss of $8.5 million which it attributes to Fuller's cessation of construction. However, having thus sought damages for the loss of the building, the suit also seeks to recover almost $66 million for the loss of anticipated net rental revenues over the forty-year useful life of the building.

concerned determinations of insolvency in ordinary bankruptcy proceedings, and not good faith in reorganization proceedings; as we have pointed out, although a claim or pending lawsuit may not be sufficiently liquid to assist in the payment of debts within a reasonable time in ordinary bankruptcy, it may be of some value in assisting in reorganization, especially where it is not merely an independent claim of the debtor but is interrelated with the claims of objecting creditors. In re Universal Lubricating Systems, 150 F.2d 832, (3rd Cir. 1945), Central States Electric Corp. v. Austrian, 183 F.2d 879 (4th Cir. 1950), and In re Vicksburg Bridge & Terminal Co., 22 F.Supp. 490 (S.D.Miss.1937), were reorganization proceedings. In those cases the debtor had instituted lawsuits which were pending [12] at the time the plan of reorganization was being formulated, and the shareholders argued that those claims should not be ignored and thus, since the arguable value of those claims, when added to the assets of the corporation, would be sufficient to make the corporation solvent, full participation by the stockholders in the plan should be permitted. However, in none of the cases was it necessary to consider those suits in effecting reorganization— plans of reorganization were effected without the necessity for reliance on those suits, and in *Universal Lubricating* and *Central States* the plans preserved the interest of the stockholders in the pending suits for their benefit. Thus those cases are of no real help on the narrow point before us, although they may be of assistance at the plan stage of this proceeding.

It may be—and this possibility further supports good faith—that the suit here in question will be far enough advanced at the time a plan is formulated that its eventual success could be reasonably predicted and it could be fully and affirmatively considered as a part of the plan. Counsel for the debtor urges that the recent holding of the Supreme Court in Katchen v. Landy, 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966), indicates that if the petition is not dismissed now and Fuller is thus forced to file its claim [13] against the debtor in this proceeding, then the claim by the debtor against Fuller, now pending in state court, may be pressed by the trustee as a counterclaim in this proceeding, and may be heard and decided summarily by this Court; thus, he argues, the determination of the merits of the debtor's claim will quite probably be expedited, and thus there is no reason at this time to disregard the possible validity of the debtor's claim upon the supposition that its uncertainty is increased by the long delays ordinarily attendant in the determination of similar suits. Further, he argued, should Fuller refuse to file its claim in order to avoid the summary hearing of the anticipated counterclaim, the debtor's position would be enhanced by the deletion of quite a large claim which could not later be reurged once the delays for filing of claims have run.

We are not prepared to rule now on the validity of debtor's interpretation of Katchen v. Landy, nor, as previously indicated, are we prepared to guess at the validity of the debtor's claim against Fuller. Rather, we prefer to base our consideration of the claim against Fuller

---

12. In *Vicksburg Bridge*, the lawsuit was not actually pending—it had been brought but dismissed for want of personal jurisdiction, and the reorganization court had not yet decided to permit it to be brought where the defendants resided.

13. The Court has not yet prescribed the manner in which, nor fixed the time within which, proofs of claim are to be filed. § 196 of the Act, 11 U.S.C.A. § 596.

Thus Fuller has not formally presented its claim. However, in its answer filed pursuant to § 137 of the Act, 11 U.S.C.A. § 537, Fuller, in delineating its status as a creditor, stated that Plaza Towers, Inc., is indebted to it in an amount exceeding $2,800,000 for work performed and materials supplied; Fuller's attorneys, in filing the statement required of them under § 210 of the Act, 11 U.S.C.A. § 610, similarly described Fuller's claim.

on the results which obtained in a reorganization proceeding in this district, In the Matter of Magnolia Park, Inc., Bankruptcy Docket No. 9010, E.D.La., in which our predecessor-once-removed, the Honorable J. Skelly Wright, now Judge of the United States Court of Appeals for the District of Columbia Circuit, was faced with the following situation: the petitioning debtor, which was engaged in the conduct and presentation of thoroughbred horse racing, had sold its racetrack, with a lease-back provision; prior to the reorganization proceeding, judgment had been entered against it cancelling its only substantial asset, the leasehold interest in the racing facilities. The referee in bankruptcy, sitting as special master to hear and report to the judge, determined that the petition was not filed in good faith because there was no possibility of reorganizing the corporation in the absence of the leasehold interest. Judge Wright determined that since the trustee might have a valid action, under Article 2589 of the Louisiana Civil Code, for rescission of the original sale of the racetrack, the possibility of success in that action was sufficient to support a finding that the petition was filed in good faith.

Judge Wright's decision, standing alone, lends support to our conclusion here, and later developments in that same matter further bolster our decision. Notice of appeal of Judge Wright's decision was filed. However, prior to argument on appeal, the complex dispute between the landlord and tenant-debtor-corporation was settled, a new lease was prepared, and a reorganization plan was indeed adopted. In the case before us, the building must be completed, and it undoubtedly should and will be completed by Fuller. The possibilities of entering into a compromise arrangement, just as happened in *Magnolia Park* despite the seemingly irreconcilable differences, which would greatly facilitate the reorganization of this corporation, are present. Such possibilities cannot be totally ignored in the formulation of our decision herein.

For the reasons enunciated in this opinion, it is ordered that the petition be, and the same is hereby, approved pursuant to § 144 of the Bankruptcy Act, 11 U.S.C.A. § 544.